Filed 1/15/16  P. v. Ventura CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILBUR VENTURA,<br><br>    Defendant and Appellant. | B263137<br><br>(Los Angeles County<br>Super. Ct. No. BA415580) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig Richman, Judge.  Affirmed.

Law Offices of Andy Miri, Andy Miri, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Viet H. Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant Wilbur Ventura (defendant) was captured on surveillance video assaulting a former friend, Luis Gonzalez Zepeda (Gonzalez). Defendant was accompanied by his friend "Wilmer," and the surveillance video shows Wilmer taking Gonzalez's bicycle. Just minutes later, defendant and Wilmer encountered Jose "Luigi" Gonzalez (Luigi), Chrystian Bustamante (Bustamante), Jaime Torres (Torres) and Pedro Tafoya (Tafoya) outside a liquor store. Bustamante and Torres had been watching defendant's fight with Gonzalez. A fight then broke between defendant and Luigi after the two exchanged words, and defendant stabbed Luigi fatally; he also stabbed Bustamante five times, but Bustamante survived. The District Attorney charged defendant with the assault and robbery of Gonzalez, the murder of Luigi, and the attempted murder of Bustamante. At trial, defendant testified in his own defense, denying any knowledge that Gonzalez's bicycle was stolen and claiming he stabbed Luigi and Bustamante in self-defense. We are asked to decide whether the two incidents were properly tried together and whether sufficient evidence supports the robbery, attempted murder, and murder convictions.

FACTS

A. *Assault and Robbery of Gonzalez*

Until about a month before defendant assaulted and robbed Gonzalez, the two men were on good terms. Things changed when defendant overheard Gonzalez say something bad about a mutual friend and told Gonzalez that he did not appreciate what Gonzalez had said. When defendant later encountered Gonzalez in an alley, Gonzalez believed that defendant "wanted to settle it . . . by getting down." Gonzalez decided to run away rather than fight, because defendant had someone with him.

Gonzalez next saw defendant on August 25, 2013, when he rode his bicycle to the liquor store to buy some beer. After buying the beer, he then went to a nearby

2

laundromat to socialize with friends. Gonzalez saw defendant "tagging" a nearby wall.[1] Defendant then walked toward the laundromat. According to Gonzalez, "we both saw each other and like knew like that was the moment it was going to happen." Gonzalez told detectives that defendant rushed toward him with a "ninja kick" and defendant's friend Wilmer joined in the fight. Defendant and Wilmer kicked and punched Gonzalez, who fell to the ground. Defendant told Gonzalez that he was "lucky that [defendant] didn't shank [him]." Gonzalez "blanked out for a couple seconds." The next thing Gonzalez remembered was getting up, going home, and then going to the emergency room. When he got up, he realized his bicycle was missing. Gonzalez testified at the preliminary hearing that he saw defendant and Wilmer leave with his bicycle, but also testified that he could not remember if defendant actually walked away with his bicycle. At trial, he testified that he thought that Wilmer took the bicycle, but did not really remember.

A surveillance camera from the laundromat recorded much of the assault on Gonzalez. The timestamp of the video places the assault and robbery as beginning around 1:42 a.m. and ending around 1:48 a.m. The video, which was played during trial, shows defendant running across the street toward Gonzalez, pulling him down by his hair and kicking him in the head several times. On the video footage, defendant and Wilmer leave and then return. Wilmer goes directly across the parking lot toward the area where Gonzalez left his bicycle, while defendant walks to Gonzalez's location. Defendant testified at trial that he is speaking with Gonzalez at this point. On the video footage, Wilmer comes over with the bicycle while defendant is speaking to Gonzalez. Defendant and Wilmer leave, but defendant comes back briefly and kicks Gonzalez again; defendant explained at trial that he kicked Gonzalez because Gonzalez said something. Defendant

---

[1]     Tagging is the term for marking walls and surfaces with graffiti. A tagging crew is a group of taggers formed for the specific purpose of marking surfaces with identifying letters, names, or logos. (*In re Angel R.* (2008) 163 Cal.App.4th 905, 912, fn. 6.)

and Wilmer leave "for a while," then return without the bicycle. Defendant kicks Wilmer again.

B. *Murder of Luigi and Attempted Murder of Bustamante*

During at least part of defendant's assault on Gonzalez, Torres and Bustamante were inside Sammy's Liquor Store at 9th Avenue and Jefferson Boulevard while Tafoya and Luigi were waiting for them in a car outside the liquor store. As Torres and Bustamante returned to the car, they saw defendant and another man fighting with Gonzalez down the street.

When Bustamante and Torres reached the car, defendant approached them. Bustamante, Torres, and Tafoya all testified that defendant spoke with Luigi. All three gave a similar account of the verbal exchange. According to Torres and Tafoya, defendant asked Luigi, "Where are you from?" Tafoya added that defendant "claimed his hood." Luigi then "claimed his hood," and defendant became agitated and said, "This is my area. This is my hood." Bustamante said that defendant "banged on" Luigi and claimed his (defendant's) tagging crew.

According to Torres, Tafoya, and Bustamante, defendant and Luigi began fighting and Bustamante intervened to help Luigi. In Torres's account, defendant threw the first punch at Luigi, and Bustamante intervened and punched defendant. Bustamante and Luigi were able to walk away from the fight. Defendant came after them with a knife, and slashed at them. Bustamante swung his belt toward the knife, but defendant stabbed Bustamante. Bustamante fled. Luigi swung something at defendant, and defendant tackled Luigi. As Luigi was on the ground, defendant stabbed him multiple times.

According to Bustamante, defendant pulled out a knife immediately after he had words with Luigi. Defendant started throwing punches at Luigi with the knife in his hand. Bustamante intervened when he saw the knife, and tried to separate the men. He used his belt to try to prevent defendant from stabbing Luigi. Defendant stabbed Bustamante in the forehead and nose, and split his ear in half. Defendant also stabbed Bustamante in the knees and the side of his body. Bustamante saw defendant run back to

4

Luigi and hit him in the chest. Then, according to Bustamante, "I just seen Luigi going flat. Like, he lost all control of his body."

According to Tafoya, Luigi and defendant just started fighting. Tafoya did not see a knife in defendant's hand and did not see who threw the first punch. He saw Bustamante intervene in the fight and swing his belt toward defendant's arms. Bustamante returned to the car, bleeding. Tafoya saw that Luigi was on the ground with defendant on top of him. Defendant was making stabbing motions toward Luigi's stomach. Luigi did not fight back.

Torres and Tafoya testified that defendant did not call for help during the fight or attempt to flee. Bustamante testified that defendant never said he wanted to stop fighting.

Surveillance video from Sammy's Liquor Store captured the beginning of the incident. It shows defendant and Luigi approaching each other, with Luigi in the street and defendant at the edge of the sidewalk. Defendant begins advancing into the street toward Luigi and Luigi backs away from defendant. Defendant makes arm movements. Defendant's and Luigi's movements take them out of the range of the surveillance video, and the fight was not recorded by the surveillance camera. The video later shows Bustamante running off the screen, in the direction that Luigi and defendant went. Luigi, defendant, and Bustamante briefly reappear on the surveillance video. Bustamante appears to be swinging his belt. Defendant backs away from Luigi and Bustamante, and defendant then runs toward them. The fight again moves out of range of the camera.

Luigi died as a result of multiple stab wounds. He had two wounds to his chest, one of which made a "big hole" in his heart. This wound was life-threatening and would have immediately caused Luigi to fall to the ground. Luigi also suffered a stab wound to his stomach, one to his back, one to his cheek and one to his foot.

Los Angeles Police Department (LAPD) Detective Michael Lavant processed the crime scene. No weapons were recovered near Luigi's body. A hammer head and broken hammer handle were located in the area of the fight. The parties stipulated DNA from Luigi was found on the hammer handle, and a DNA sample from the hammer head showed defendant and Bustamante as possible contributors to the sample. Detective Eloy

5

Ochoa searched the rooftop of Sammy's Liquor because surveillance video showed defendant throwing an object on to the roof. He found a black folding knife.

Defendant fled the scene after the fight. He called police on his cell phone and reported that he had been robbed. LAPD Officer Edward Jimenez found defendant at the corner of 7th Avenue and 36th Street, being treated by paramedics. This location is three blocks from Sammy's Liquor Store and the laundromat. Defendant claimed he had been attacked by several individuals and robbed. Defendant told Officer Jimenez the men drove up to him in a car, got out, asked him where he was from, and hit him on the head with an object, causing him to fall to the ground. One of them took his backpack, and they all fled. Defendant said the robbery occurred in the area of 7th Avenue and 36th Street. Defendant said nothing about the fight he had been involved in with Luigi and Bustamante in the area of 9th and Jefferson, nor did he say that he had had to stab a man out of fear for his safety. Officer Jimenez did not find any evidence to substantiate defendant's robbery claim.

Detective Ochoa, who helped investigate the stabbings of Luigi and Bustamante, later questioned defendant at the police station. A recording of the interview was played for the jury. In his statement to Detective Ochoa, defendant claimed that he initially told police that he had been robbed because he was confused. Defendant claimed that Luigi and two other men approached him, and Luigi stated that he was from "18th Street." Luigi asked defendant what he had in his pockets. Defendant said he started backing away from Luigi. Another man came up behind defendant, causing defendant to back up into the street. Defendant saw a hammer and pulled out his knife. The men backed up, but then began hitting him.

When asked by Detective Ochoa, defendant could not explain how Luigi and Bustamante suffered stab wounds. Detective Ochoa testified that defendant's account was not consistent with the surveillance video. That video did not show a man coming up behind defendant and did not show defendant backing into the street. Detective Ochoa told the jury that defendant did not mention his earlier fight with Gonzalez until Detective Ochoa confronted him with it.

6

Detective Ochoa also testified that defendant denied taking Gonzalez's bicycle or even knowing that the bicycle was taken. Detective Ochoa noted that the video footage showed defendant place his hand on the back of the bicycle as Wilmer rode it away.

C. *The Defense Case*

Defendant testified in his own defense at trial. He explained that he had been friends with Gonzalez at one point, but they had a falling out. Weeks before he fought Gonzalez outside the laundromat, defendant heard that Gonzalez intended to beat him up. When defendant saw Gonzalez at the laundromat on August 25, 2013, he ran up to Gonzalez and started fighting. Neither man said anything. Wilmer joined in, and when Gonzalez was on the ground, defendant stomped on and kicked his head. Wilmer and defendant walked away. Defendant then walked back to Gonzalez and kicked him because he had said something. Defendant was really mad at Gonzalez. Defendant claimed he didn't know that anyone took Gonzalez's bicycle until he saw the surveillance video at trial.

After the fight, defendant was walking with Wilmer when he noticed a group of men had been watching the fight from the liquor store. The men asked him what had happened. Bustamante, who was in the group of men, asked defendant where he was from. Defendant replied that he did not "gang-bang." Bustamante claimed "18th Street." Defendant replied, "Cool" and shook hands with Bustamante.

At some point thereafter, Luigi asked defendant to give him whatever he had in his pockets. Defendant refused. He stepped out into the street, and started walking forward while Luigi backed up. Defendant believed there was someone behind him so he continued toward the street. In the middle of the street, Luigi got into a "fight stance" and defendant did the same. Luigi started swinging at defendant, and they began fighting.

Defendant felt something hit him in the head, and turned and saw Bustamante with a hammer. Bustamante hit defendant in the face with the hammer. Defendant was afraid "they were going to do something really bad to [him] to a point where [he] was going to

7

die" and took out his knife. Luigi continued punching defendant, so he started moving his knife (the trial judge described the movement defendant made in court as "slashing"). Bustamante was also hitting defendant, and defendant fell to the ground. One man held him down while another man hit him. Defendant continued swinging his knife until he was able to break free. He then fled.

As he left the area of the laundromat, defendant was afraid and did not want to go to jail. He got rid of the knife by throwing it. He called 911 because he needed an ambulance. At the hospital, defendant received 14 stitches to his right eyebrow area and staples in the back of his head. He was in pain, weak, and scared.

He did not tell the police about throwing the knife onto the roof because he did not remember doing it. He did not tell the police that he had stabbed anyone because he did not know that he stabbed anyone. He did not remember and could not explain how he ended up stabbing Luigi six times or Bustamante five times. Defendant denied being a tagger.

Defendant also offered the testimony of toxicologist Dr. Rody Predescu, who stated that Luigi had alcohol and methamphetamine in his blood. Dr. Predescu opined that Luigi's blood alcohol level would have made him intoxicated and impaired. The level of methamphetamine in Luigi's blood was low, but might have caused aggressive and violent behavior. In addition, defendant offered the testimony of criminalist Kenneth Moses that if the hammer had been used as a weapon, "some degree of force" was needed to break it.

D. *Conviction*

The jury convicted defendant on all counts: the count 1 first degree murder of Luigi in violation of Penal Code section 187;[2] the count 2 willful, deliberate, and premeditated attempted murder of Bustamante in violation of sections 187 and 664, subdivision (a); the count 3 assault of Gonzalez in violation of section 245, subdivision

[2]     Undesignated statutory references that follow are to the Penal Code.

8

(a)(4); and the count 4 robbery of Gonzalez in violation of section 211.  The jury also found true the allegations that defendant personally used a deadly and dangerous weapon in the commission of the murder and attempted murder and personally inflicted great bodily injury in the commission of counts 2 though 4.  The trial court sentenced defendant to a term of 26 years to life on the murder conviction, life in prison with the possibility of parole plus 4 years on the attempted murder conviction, 1 year for the assault conviction, and 8 years for the robbery conviction.

## DISCUSSION

Defendant contends the trial court abused its discretion in denying his motion to sever trial of the counts charging the assault and robbery of Gonzalez from the counts charging murder and attempted murder.  He argues the evidence of guilt concerning the assault was stronger and, in his view, unfairly prejudiced his defense to the other charges.  Defendant also contends the evidence is insufficient to support his robbery conviction because it shows he assaulted Gonzalez for personal reasons and formed an intent to rob Gonzalez, if at all, only after the use of force or fear had finished.  Defendant further contends the evidence of self-defense is so overwhelming that the murder and attempted murder convictions must be reversed.  Finally, he argues there is no evidence that he acted with premeditation and deliberation in murdering Luigi and attempting to murder Bustamante, and so the jury's finding that the murder was in the first degree and the attempted murder was willful, premeditated, and deliberate must be reversed.  We reject defendant's contentions and affirm the judgment.

## I.

## Denial of Motion to Sever

A. *Trial Court's Ruling*

Defendant moved to sever the assault and robbery charges on the grounds: (1) that the offenses were unconnected in their commission; (2) that the offenses were not of the

9

same class; and (3) joinder of the trial would unduly prejudice appellant.  The prosecution opposed the motion.

The motion to sever was heard on November 17, 2014.  The court ruled:  "I'm going to deny the motion to sever in this matter.  I believe the case meets the requirements of [the] People versus Williams case[3] and the elements, evidence is cross-admissible, and in the court's judgment based upon what I have read and I simply believe it meets the prongs that are required for these matters to be heard in the same trial."

B.  *Analysis*

Section 954 provides in pertinent part:  "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . ."  Robbery, assault, attempted murder, and murder involve the common element of assault, and so belong to the same class of crime.  (See *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1243 [robbery and murder are same class of crime].)[4]

The law prefers consolidation of charges.  (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.)  Because the charges here involve offenses of the same class, "'the statutory requirements for joinder were satisfied,' and defendant 'can predicate error in

---

[3]    It appears the trial court was referring to *Williams v. Superior Court* (1984) 36 Cal.3d 441, superseded by statute on other grounds as stated in *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1229, fn 19.

[4]    The offenses in this case are arguably connected in their commission as well.  The events occurred very close together in time and location.  According to defendant's trial testimony, after the fight with Gonzalez, defendant noticed a group of men who had been watching the fight.  They asked him what had happened.  Defendant replied that Gonzalez had been "running his mouth."  Bustamante then asked defendant where he was from; defendant testified that such a question means the questioner wants to know if you're from a gang and "want[s] to know why you're on their turf, basically."  Then, the fighting started.

denying the motion only on a clear showing of potential prejudice. [Citation.] We review the trial court's ruling on the severance motion for abuse of discretion.' (*People v. Kraft* (2000) 23 Cal.4th 978, 1030; see *People v. Soper* (2009) 45 Cal.4th 759, 773-774.)" (*People v. Vines* (2011) 51 Cal.4th 830, 854-855.)

"'''''''The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.] [¶] "The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial." [Citation.] Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citations.]'''" (*People v. Kraft, supra*, 23 Cal.4th at p. 1030, quoting *People v. Bradford* (1997) 15 Cal.4th 1229; see also *People v. Soper, supra*, 45 Cal.4th at pp. 774-775.)" (*People v. Vines, supra*, 51 Cal.4th at p. 855.)

If the "evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others . . . any inference of prejudice is dispelled."[5] (*People v. Vines, supra*, 51 Cal.4th at p. 855.)

---

[5] Evidence Code section 1101, subdivision (a) "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) "[T]his rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ibid.*, fn. omitted.) Evidence Code section 1101, subdivision (b) provides that nothing in that section "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan,

11

Here, defendant told Gonzalez at the start of the assault that he was lucky that defendant did not "shank" him, meaning stab him. At the time defendant made the statement, he was carrying a knife in his pocket. Thus, the assault on Gonzalez was relevant and admissible to show that defendant possessed the knife before his encounter with Luigi and Bustamante, and did so for an offensive purpose. It is indicative of defendant's state of mind when he approached Luigi and Bustamante, and shows that defendant was prepared for a violent encounter. It is also relevant to show the absence of mistake or accident. Although defendant attempted to minimize his use of the knife during the encounter by demonstrating that he used slashing motions and claiming that he did not know how Luigi suffered the stab wounds, defendant's statement to Gonzalez shows that he was aware of and had considered his knife's potential to inflict serious injury by "shanking."

"Moreover, even if the evidence underlying these charges would not be cross-admissible in hypothetical separate trials, that determination would not itself establish prejudice or an abuse of discretion by the trial court in declining to sever properly joined charges." (*People v. Soper* (2009) 45 Cal.4th 759, 775.) If the evidence would not be cross-admissible, we consider two additional factors to determine if there is any possible spill-over effect of the "other-crimes" evidence: "(1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges . . . ." (*Ibid.*)[6]

In this case, the relevant factors do not show any possible "spill-over" effect from the robbery and assault charges. Robbery and assault are less serious offenses than attempted murder and murder, and so are not crimes particularly likely to inflame the jury

---

knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

[6]     A third factor considers whether a capital offense is charged. This was not a capital case.

12

against defendant. Further, defendant did not use a weapon in the commission of the assault, but did use a knife in the commission of the murder and attempted murder making it even more unlikely the assault charge would inflame the jury against defendant.

Nor was a weak case joined with a strong case. Because defendant essentially admitted the assault on Gonzalez, evidence on that charge was strong. However, the evidence on the murder and attempted murder charges was strong as well. Three witnesses described defendant's attack on Luigi, Bustamante's intervention, and defendant's attack on Bustamante. It was undisputed that defendant had and used a knife during the fight with Luigi and Bustamante. Defendant's self-defense theory, on the other hand, was weak. No weapon was found on or near Luigi's body. The surveillance video contradicted a number of defendant's claims about how the fight progressed and undermined his self-defense claim.[7] There was no clear showing of potential prejudice from the joinder of the charges. The jury was properly instructed that each of the counts charged was a separate crime that the jury was required to consider separately. The trial court did not abuse its discretion in denying the motion to sever.

## II.

### Sufficiency of the Evidence to Support the Robbery Conviction

A. *Standard of Review*

""""[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of

---

[7] The video showed defendant as an aggressor at the beginning of the fight, when he advanced toward Luigi, who kept retreating. It again showed defendant as an aggressor after Bustamante joined the fight; defendant backed up, then charged forward at Bustamante with a kick.

fact could have found the essential elements of the crime beyond a reasonable doubt."
[Citation.]  In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."
[Citation.]'"  (*People v. Williams* (2015) 61 Cal.4th 1244, 1281.)

"The standard of review is the same in cases in which the People rely mainly on circumstantial evidence.  [Citation.]  'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.  "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'"'"  (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793; see *People v. Nelson* (2011) 51 Cal.4th 198, 210.)


B.  *Applicable Law*

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  (§ 211.)  Robbery is a specific intent crime.  The jury was instructed that "[t]he defendant's intent to take the property must have been formed before or during the time [he] used force or fear" and that "[a] person *takes* something when he or she gains possession of it and moves it some distance."  (CALCRIM No. 1600; see *People v. Gomez* (2008) 43 Cal.4th 249, 254 ["taking" for robbery includes both achieving possession of the property and carrying away the property].)  The jury was also instructed that "[t]o be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary safety."  (CALCRIM No. 1603; see *People v. Gomez, supra,* at p. 254; *People v. Cooper* (1991) 53 Cal.3d 1158, 1165-1166.)

There is no requirement that a robbery victim be aware that his property is being taken by force or fear.  (*People v. Jackson* (2005) 128 Cal.App.4th 1326, 1330-1331.)

14

The victim "may be unconscious or even dead when property is taken . . . ." (*Id*. at p. 1330.)

### C. *Evidence Supporting the Verdict*

Here, there is sufficient circumstantial evidence to permit a rational trier of fact to find defendant guilty of robbery beyond a reasonable doubt. Wilmer's action of going straight to the bicycle upon his return supports an inference that he intended to steal the bicycle. Defendant, who had previously hit and kicked Gonzalez, went to stand over Gonzalez while Wilmer got the bicycle. The men's actions support an inference of planning. It appears that defendant again kicked Gonzalez while Wilmer was getting the bicycle. The jury could reasonably have inferred that the kick was intended to keep Gonzalez on the ground while Wilmer got the bicycle; even without the kick, the jury could infer that defendant's presence alone was intended to instill fear in Gonzalez and keep him on the ground, given the beating which defendant had just inflicted. The law does not require that Gonzalez be aware of defendant's reason for instilling fear. Further, as defendant and Wilmer were walking away with the bicycle, defendant returned and kicked Gonzalez again, and the jury could reasonably infer the kick was intended to assure Gonzalez would not prevent defendant and Wilmer from taking the bicycle.

Even if defendant did not know that Wilmer was planning to take the bicycle until Wilmer brought it to where defendant was standing, there is still sufficient circumstantial evidence to support the conviction under an aiding and abetting theory. An aider and abettor may form the specific intent to aid the perpetrator "while [the] perpetrator carried away the property to a place of temporary safety." (CALCRIM No. 1603.) When Wilmer came over to Gonzalez, Wilmer was in the process of taking the bicycle to a place of safety. Defendant touched the seat of the bicycle and began to walk away with Wilmer. As we have explained, defendant's return to kick Gonzalez supports a reasonable inference that defendant intended to prevent Gonzalez from interfering with the taking.

15

## III.

### Sufficiency of the Evidence – Murder and Attempted Murder

Defendant contends the evidence is insufficient to support the murder and attempted murder convictions because the evidence of self-defense was overwhelming and the prosecution failed to meet its burden of proving the killing was not done in self-defense. He further contends that even if the evidence was sufficient to show murder and attempted murder, it is insufficient to show the deliberation and premeditation necessary for a first degree murder conviction, and to support the jury's finding that the attempted murder was willful, deliberate, and premeditated. We review defendant's claim in accordance with the principles set forth in *People v. Williams, supra*, 61 Cal.4th at p. 1281 and *People v. Stanley, supra*, 10 Cal.4th at pp. 792-793, as set forth in detail *ante*.

A. *Evidence of Self-Defense*

As the jury was instructed, a defendant acts in self-defense if he reasonably believes that he is in imminent danger of being killed or suffering great bodily injury and that the immediate use of deadly force is necessary to defend against that danger. A defendant acts in "imperfect" self-defense if he actually believes that he is in imminent danger and that the use of deadly force is necessary, but one of those beliefs is unreasonable. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) The People have the burden of proving beyond a reasonable doubt that the defendant did not act in perfect or imperfect self-defense. (*People v. Rios* (2000) 23 Cal.4th 450, 454 [where murder liability at issue, the People must prove absence of a belief in the need for self-defense]; *People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168 [self-defense]; CALCRIM Nos. 505, 571.)

Defendant's testimony is evidence that he acted in some form of self-defense. According to defendant, Luigi and Bustamante tried to rob him. When he refused to hand over his property, Luigi attacked him and Bustamante hit him with a hammer. Defendant then used his knife to defend himself. However, a rational trier of fact could have disbelieved defendant's account of events and instead believed the testimony of

16

Bustamante and Torres, which was corroborated at least in part by the video surveillance footage.

Bustamante testified that defendant began a gang-related argument with Luigi, and almost immediately pulled out a knife and began punching Luigi. Bustamante then intervened to try to separate the two men, and used his belt to try to deflect the knife. Defendant stabbed Bustamante repeatedly and then stabbed Luigi repeatedly and fatally. The liquor store video was consistent with Bustamante's account and inconsistent with defendant's account; it showed defendant walking toward Luigi with raised hands while Luigi backed away. Torres's account also portrayed defendant as the aggressor with the knife. Tafoya specifically testified that Luigi did not fight back.

In addition to Bustamante and Torres's account of events, defendant's behavior after the altercation called defendant's claim of self-defense into question. Surveillance video showed defendant throwing an object onto the roof of the laundromat; a knife was later found there. Defendant did call 911 and reported that he was the victim of a robbery, but he did not make a claim of self-defense to the investigating officer or mention a knife or a stabbing. He gave the officer a false location for the supposed robbery. These actions were consistent with consciousness of guilt.

Bustamante and Torres's testimony, together with evidence of defendant's behavior after the stabbings, is more than sufficient evidence from which a rational trier could find that the prosecution proved beyond a reasonable doubt defendant did not act in any form of self-defense. Even if the evidence might also "reasonably be reconciled with a contrary finding" that defendant did act in self-defense, reversal would not be warranted. (*People v. Stanley, supra,* 10 Cal.4th at pp. 792-793.)

B. *Premeditation and Deliberation*

For purposes of determining whether sufficient evidence of premeditation and deliberation exists, there is no distinction between attempted murder and completed murder. (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462, fn. 8, disapproved on another ground by *People v. Mesa* (2012) 54 Cal.4th 191.)

In *People v. Anderson* (1968) 70 Cal.2d 15, the court identified three categories of evidence typically considered when determining if a defendant acted with premeditation and deliberation: planning activity, motive, and the manner of killing. (*Id*. at pp. 26-27.) "*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)" (*People v. Pride* (1992) 3 Cal.4th 195, 247.) Premeditation and deliberation can take place in a brief period of time. "'"The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'"'" (*People v. Osband* (1996) 13 Cal.4th 622, 697.)

Here, there is some evidence of all three *Anderson* factors. The evidence permitted the jury to infer that defendant had a motive, or possibly two motives, for killing Luigi and attempting to kill Bustamante. One motive was gang/tagging crew related. Defendant was seen tagging a wall in the area of the laundromat before he assaulted Gonzalez. After attacking Gonzalez, defendant approached Luigi and asked him where he was from, which was understood as an inquiry into Luigi's gang affiliation. According to Tafoya, defendant "claimed his hood" and said "this is my area." According to Bustamante, defendant "banged on" Luigi and claimed his tagging crew. This exchange supports an inference that gang or tagging crew animosity was the motive for defendant to kill the two men. In addition, there was evidence at trial of another motive defendant had to kill Luigi and Bustamante: both men saw defendant beating and robbing Gonzalez. The jury could infer he wanted to eliminate them as witnesses. (*People v. Caro* (1988) 46 Cal.3d 1035, 1050, overruled on another ground by *People v. Whitt* (1990) 51 Cal.3d 620, 657, fn. 29 [no evidence of prior relationship, but jury could reasonably infer defendant killed victim because she was an actual or potential witness to kidnapping].)

Relevant to planning, defendant approached the men to initiate the gang-related exchange and, according to Bustamante, defendant almost immediately pulled a knife and began using it. This supports an inference that defendant planned to attack Luigi if he did not give the response defendant wanted, or that defendant did not expect a satisfactory response. Defendant's act of confronting Luigi with his knife at the ready, particularly in light of the motive evidence, supports an inference that he planned to use the knife against Luigi as part of a premeditated intent to kill. When Bustamante came to Luigi's aid, defendant immediately turned his knife on Bustamante.

The manner of the stabbing supports an inference that defendant intended to use the knife to kill Luigi and Bustamante. He stabbed Luigi through the heart, an almost instantly fatal blow. He stabbed Bustamante in various areas of the head, and sliced open Bustamante's ear. Both attacks targeted areas of the body where a knife wound can be fatal. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 [firing at a vital area at close range supports finding of premeditation and deliberation]; see *People v. Cruz* (1980) 26 Cal.3d 233, 245; see also *People v. Hovey* (1988) 44 Cal.3d 543, 556.)

This evidence of motive, planning, and manner of killing supports an inference that the killing and attempted killing were the result of preexisting reflection. There is substantial evidence from which a rational trier of fact could find defendant guilty beyond a reasonable doubt of first degree murder and willful, deliberate, and premeditated attempted murder. Even if the evidence might also "reasonably be reconciled with a contrary finding," reversal would not be warranted. (*People v. Stanley, supra,* 10 Cal.4th at pp. 792-793.)

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:



TURNER, P.J.



KRIEGLER, J.